ACCEPTED
03-14-00735-CV
5109682
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/30/2015 5:15:27 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00735-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/30/2015 5:15:27 PM
JEFFREY D. KYLE
Clerk

## IN THE COURT OF APPEALS
## FOR THE THIRD DISTRICT OF TEXAS
## AUSTIN, TEXAS

### ENTERGY TEXAS, INC.
**Appellants,**

**v.**

### PUBLIC UTILITY COMMISSION OF TEXAS
**Appellee.**

*Appeal from the 353rd Judicial District Court, Travis County, Texas*
*The Honorable John K. Dietz, Judge Presiding*

## APPELLEE TEXAS INDUSTRIAL ENERGY CONSUMERS' BRIEF

### APRIL 30, 2015

Rex D. VanMiddlesworth
rex.vanmiddlesworth@tklaw.com
State Bar No. 20449400
Benjamin Hallmark
benjamin.hallmark@tklaw.com
State Bar No. 24069865
**THOMPSON & KNIGHT LLP**
98 San Jacinto Blvd., Suite 1900
Austin, TX 78701
Telephone: (512) 469-6100
Facsimile: (512) 469-6180
**ATTORNEYS FOR APPELLEE TEXAS
INDUSTRIAL ENERGY CONSUMERS**

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES.................................................................iii

STATEMENT OF THE CASE ...........................................................iv

STATEMENT ON ORAL ARGUMENT ............................................. v

RESTATED ISSUES PRESENTED..................................................... v

STATEMENT OF FACTS ................................................................. 1

SUMMARY OF ARGUMENT............................................................ 6

ARGUMENT AND AUTHORITIES ................................................... 9

    I.      The PUC properly applied its longstanding historical-test-year standard. .........................................................................................9

          A.     The known and measurable standard. ...............................11

          B.     ETI's true complaint is with the PUC's cost-of-service rules, not the PUC's application of them. ..................................... 14

    II.    Substantial evidence supports the PUC's determination of ETI's purchased-capacity costs. ............................................................ 15

          A.     The PUC properly found that ETI's forecasted purchased-capacity costs were not known and measurable.............................. 16

                1.    ETI's projected third-party contract costs were not reasonably certain.................................................................................20

                2.    ETI's projected affiliate-contract costs were not reasonably certain.................................................................................25

                3.    ETI's projected MSS-1 costs were not reasonably certain. ...28

                4.    ETI's proposal failed to account for revenues from load growth. .................................................................................30

           B.     Having failed to meet its burden of proof, ETI is not entitled to its proposed post-test-year adjustments. ..................................... 34

i

III.  The PUC properly rejected ETI's proposal to base transmission equalization expense on projections of future costs. ................................... 36

    A.    Substantial evidence supports the PUC's decision. ......................... 38

        1.    ETI's transmission-equalization costs are variable and uncertain. ............................................................................... 39

        2.    ETI's projections were based on projects that were not yet in-service. ............................................................................. 40

CONCLUSION AND PRAYER ..................................................................... 42

CERTIFICATE OF COMPLIANCE ............................................................. 43

CERTIFICATE OF SERVICE ....................................................................... 44

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Amarillo Indep. Sch. Dist. v. Meno*,
854 S.W.2d 950 (Tex. App.—Austin 1993, writ denied)...................................16

*Cent. Power & Light Co. v. Pub. Util. Comm'n of Texas*,
36 S.W.3d 547 (Tex. App.—Austin 2001, pet. denied).............................. *passim*

*City of El Paso v. Pub. Util. Comm'n of Texas*,
883 S.W.2d 179 (Tex. 1994)...................................................... *passim*

*City of El Paso v. Pub. Util. Comm'n*,
344 S.W.3d 609 (Tex. App.—Austin 2011, no pet.) .............................................2

*Gerst v. Guardian Sav. & Loan Ass'n*,
434 S.W.2d 113 (Tex. 1968)................................................................16

*Lewis v. Metropolitan Sav. & Loan Ass'n*,
550 S.W.2d 11 (Tex. 1977)................................................................16

*Suburban Util. Corp. v. Pub. Util. Comm'n of Texas*,
652 S.W.2d 358 (Tex. 1983)................................................... 2, 10, 12

*Rodriguez v. Serv. Lloyds Ins. Co.*,
997 S.W.2d 248 (Tex. 1999)................................................................16

*Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*,
665 S.W.2d 446 (Tex. 1984)................................................................16

## STATUTORY AND REGULATORY AUTHORITIES

16 Tex. Admin. Code § 23.21...............................................................13

16 Tex. Admin. Code § 25.5.................................................................3

16 Tex. Admin. Code § 25.231 ...................................................... *passim*

16 Tex. Admin. Code § 25.234..............................................................13

Tex. Util. Code §§ 11.001 ..................................................................................1

Tex. Util. Code § 11.003..................................................................................10

Tex. Util. Code § 15.001 ..................................................................................16

Tex. Util. Code § 31.001 ....................................................................................1

Tex. Util. Code § 36.003 ....................................................................................1

Tex. Util. Code § 36.006. ............................................................................ 35, 36

Tex. Util. Code § 36.051. ....................................................................................2

## STATEMENT OF THE CASE

This is an administrative appeal of a final order of the Public Utility Commission of Texas (the PUC) in a contested-case proceeding. Entergy Texas, Inc. (ETI) initiated the underlying proceeding, Docket No. 39896, seeking authority to raise its electric rates and reconcile its fuel costs.

## STATEMENT ON ORAL ARGUMENT

To the extent the Court grants any request for oral argument, TIEC requests the opportunity to be heard.

## RESTATED ISSUES PRESENTED

(1)    Should the Court invalidate the PUC's longstanding, rule-based practice of setting future rates based on historical costs?

(2)    Does substantial evidence support the PUC's determination that ETI's projections of its future purchased-capacity costs were not known and measurable changes to its historical-test-year costs?

(3)    Does substantial evidence support the PUC's determination that ETI's projections of its future transmission-equalization expense were not known and measurable changes to its historical-test-year costs?

## STATEMENT OF FACTS

Appellee Texas Industrial Energy Consumers (TIEC) is an association of industrial consumers whose principal purpose is to address electricity matters at the PUC.[1] TIEC, an intervenor in the underlying administrative proceeding, files this brief in support of the PUC's determination of ETI's purchased-capacity and transmission-equalization expenses.[2]

## Regulatory background

Because ETI is a government-sanctioned monopoly in its service area, the PUC regulates its rates, operations, and services as a substitute for competition.[3] As part of that system of regulation, the Public Utility Regulatory Act (PURA)[4] directs the PUC to ensure that utility rates are "just and reasonable."[5] PURA does not define "just and reasonable" rates, but provides that the PUC "shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and

---

[1] AR Part I, Binder 1, Item 1 (Motion to Intervene of Texas Industrial Energy Consumers). References to the administrative record are to the revised index submitted with the supplemental administrative record on March 25, 2015. The administrative record (AR) is organized by binders, exhibits, and transcripts.

[2] TIEC thus responds to ETI's second and third issues on appeal. *See* ETI Appellant's Brief at x-xi.

[3] AR Part II, Binder 31, ETI Ex. 4 (Domino Direct at 1). Tex. Util. Code § 31.001(b).

[4] PURA is codified at Tex. Util. Code §§ 11.001 *et seq.*

[5] PURA § 36.003(a).

1

necessary operating revenues."[6] In Texas, "future rates are made on the basis of past costs," and the PUC has long relied on a utility's historical costs to meet the objective of setting just and reasonable rates.[7] Thus, to calculate a utility's revenue requirement, the PUC's rules provide that "rates are to be based upon an electric utility's cost of rendering service to the public during a historical test year, adjusted for known and measurable changes."[8]

## The PUC proceeding

ETI initiated the underlying proceeding at the PUC seeking authority to raise its rates.[9] One of the major issues in the case was the amount of purchased-capacity costs to be included in ETI's base rates. A utility's purchased-capacity costs are expenses recovered through base rates.[10] The record evidence established that ETI had incurred approximately $246 million in purchased-capacity costs during the historical test year for the case.[11] ETI proposed to disregard this figure in setting rates.

---

[6] PURA § 36.051.

[7] *Suburban Util. Corp. v. Pub. Util. Comm'n of Texas*, 652 S.W.2d 358, 366 (Tex. 1983).

[8] 16 Tex. Admin. Code § 25.231(a).

[9] AR Part II, Binder 31, ETI Ex. 4 (Domino Direct at 7).

[10] *City of El Paso v. Pub. Util. Comm'n*, 344 S.W.3d 609, 614 (Tex. App.—Austin 2011, no pet.).

[11] AR Part I, Binder 7, Item 244 (Order on Rehearing at 7); Tr. at 652-53; AR Part II, Binder 41 (TIEC Ex. 1B, Confidential Exhibits and Workpapers to Direct Testimony of Jeffry Pollock (CONFIDENTIAL 62) Workpapers, Filename: "Exhibits JP-1 and JP-2 HS.xlsx,"

2

ETI's primary position at the PUC was that the PUC should adopt a first-of-its-kind rider that would treat purchased-capacity costs not as a component of base rates but on a pass-through basis, much like the PUC treats fuel costs.[12] ETI also submitted an alternative proposal under which the PUC would use ETI's projections of what its purchased-capacity costs would be during a future "rate year" in setting rates.[13] ETI estimated its future purchased-capacity costs during the "rate year" would be approximately $31 million higher than the actual costs it incurred during the test year.[14]

Typically, the term "rate year" is used to refer to the first year that new rates would be in effect.[15] ETI's proposed effective date for its rates was June 30, 2012,[16] but the "rate year" it used in its proposal was not the 12 months following that date, but instead June 1, 2012 through May 31, 2013.[17] Thus, ETI proposed to

spreadsheet/tab: "PPC Summary (Test Year)")."PPC Summary (Test Year)" was also Attachment A to TIEC's Initial Brief at the District Court, AR Part II, Binder 4, Item 160 (Highly Sensitive Portions of Initial Brief of Texas Industrial Energy Consumers (CONFIDENTIAL 2).

[12] AR Part IV, Binder 43, Vol. L (Tr. at 1954, May 3, 2012).

[13] AR Part IV, Binder 43, Vol. F (Tr. at 761, Apr. 27, 2012); AR Part II, Binder 35, ETI Ex. 34A (Confidential Direct Testimony of Robert R. Cooper, Exhibit RRC-1).

[14] *Id.*

[15] 16 Tex. Admin. Code § 25.5(102).

[16] AR Part IV, Binder 43, Vol. K (Tr. at 1540, May 2, 2012).

[17] AR Part IV, Binder 43, Vol. F (Tr. at 761, Apr. 27, 2012); AR Part II, Binder 35 ETI Ex. 34A (Confidential Direct Testimony of Robert R. Cooper, Exhibit RRC-1).

set rates based on neither its historical-test-year costs nor its projected costs for the first 12 months after its new rates were implemented.

ETI's primary proposal of a purchased-capacity rider was presented in 17 pages of ETI witness Robert May's testimony, while its fallback proposal to use projected costs from what it termed "the rate year" was presented in a single sentence.[18] The PUC rejected ETI's rider proposal in a prehearing order, from which ETI does not appeal,[19] and ETI proceeded with its fallback proposal.

While ETI's actual test-year purchased-capacity costs were undisputed, the PUC Staff and multiple intervenors, including TIEC, challenged ETI's proposal to use estimates of future costs in setting rates.[20] The PUC found that there was substantial uncertainty regarding the accuracy of ETI's cost projections and that ETI had not met its burden of proof to show that its projections constituted known and measurable changes to the test-year costs.[21] The PUC also rejected ETI's proposed adjustments for an additional reason. To set rates, ETI proposed to compare its projected expenses for a future year (June 1, 2012 through May 31, 2013) with its sales revenue from the historical test year (July 1, 2010 through June

---

[18] AR Part II, Binder 31, ETI Ex. 7 (Direct Testimony of Phillip May at 5-23).

[19] AR Part I, Binder 1, Item 52 (Supplemental Preliminary Order at 2) ("The PUC finds that Entergy's proposed purchased-power recovery rider should not be considered in this docket due to the related rulemaking that is pending in Project No. 39246.").

[20] AR Part I, Binder 5, Item 185 (Proposal for Decision at 101).

[21] AR Part I, Binder 7, Item 244 (Order on Rehearing at Findings of Facts ("FoFs") 72-85).

4

30, 2011).[22] The PUC found that this mismatch between the period for calculating costs and the period for calculating revenues was a violation of fundamental ratemaking principles.[23] For these reasons, the PUC rejected ETI's proposal to use its forecasted purchased-power costs and instead set ETI's rates based on the costs it actually incurred during the test year.[24]

The PUC reached a similar result with respect to ETI's transmission-equalization expense.[25] As with its purchased-capacity costs, ETI proposed to disregard the transmission-equalization expense it actually incurred during the test year in favor of its projected expense during the future rate year.[26] The PUC found that ETI failed to meet its burden of demonstrating that its proposed adjustments to the actual test-year data were known and measurable.[27] The PUC therefore rejected ETI's forecasted transmission-equalization costs and used ETI's historical expense from the test year in setting rates.[28]

---

[22] AR Part I, Binder 5, Item 185 (Proposal for Decision at 109) (discussing mismatch of rate-year costs with test-year billing determinants).

[23] AR Part I, Binder 5, Item 185 (Proposal for Decision at 109); AR Part I, Binder 7, Item 244 (Order on Rehearing at 7).

[24] AR Part I, Binder 7, Item 244 (Order on Rehearing at FoFs 72, 86).

[25] *Id*. at FoF 88-93.

[26] AR Part II, Binders 21-30 (ETI Ex. 3, Schedule P Workpapers at AJ23).

[27] AR Part I, Binder 5, Item 185 (Proposal for Decision at 116).

[28] AR Part I, Binder 7, Item 244 (Order on Rehearing at FoFs FoF 87, 94).

ETI appealed the PUC's decision on both purchased-capacity costs and transmission-equalization expense. The district court, Judge John K. Dietz presiding, affirmed the PUC on both points.[29] ETI now appeals that decision to this Court.

## SUMMARY OF ARGUMENT

Texas is a historical-test-year state. For many years, the PUC has set future rates based on past costs. Under its cost-of-service rule, the PUC determines the utility's reasonable and necessary expenses during a historical test year. The PUC may make adjustments to the test-year data to account for known and measurable changes in the utility's expenses, but, as both the Texas Supreme Court[30] and this Court[31] have acknowledged, the decision of whether to do so is within the PUC's discretion.

Calling it an "anachronism," ETI asked the PUC to abandon this regulatory construct and provide for ETI's purchased-capacity cost recovery through a rider.[32] As a fallback proposal, ETI argued that the PUC should make an "adjustment" to its test-year data for these costs by substituting in their place ETI's projected levels

---

[29] CR 2118.

[30] *City of El Paso v. Pub. Util. Comm'n of Texas*, 883 S.W.2d 179, 188 (Tex. 1994).

[31] *Cent. Power & Light Co. v. Pub. Util. Comm'n of Texas*, 36 S.W.3d 547, 563 (Tex. App.—Austin 2001, pet. denied).

[32] AR Part IV, Binder 43, Vol. B (Tr. at 35, Apr. 24, 2012); s*ee also* AR Part I, Binder 3, Item 157 (Initial Brief of ETI at 86).

of expense for a future year. The PUC rejected the rider proposal and determined that ETI had not met its burden of proving that its future projections were known and measurable changes to the test-year costs. ETI appeals the latter point only.

While ETI is careful to couch its appeal in terms of "substantial evidence" and legal standards, it is evident that its true complaint is with the PUC's practice of setting rates based on historical data rather than future projections. Indeed, ETI's appeal on these points is premised on the notion that the PUC was *required* to make a post-test-year adjustment despite the fact that such adjustments are within the discretion of the PUC and despite the fact that ETI's proposed "adjustment" to test-year expenses was to disregard them entirely and use projections of future costs. Were the Court to grant ETI's appeal and hold that the PUC had no choice but to use ETI's projections, it would be effectively invalidating the PUC's practice of setting rates based on past costs and revenues and mandating that Texas become a future-test-year state. Such policy determinations are for the Legislature and PUC, not the judiciary.

Once ETI's misdirected attempts to overhaul longstanding Texas policy are rejected, what is left is a straightforward substantial-evidence inquiry. The historical-test-year costs ETI actually incurred for purchased capacity were established in the record and undisputed. The evidence showed that ETI's

7

projected future costs, on the other hand, were mere estimates based on numerous interrelated variables that cannot be known with certainty ahead of time. For example, ETI's third-party contracts do not contain fixed price or quantity terms, and the price ETI will ultimately pay will be based on the availability and performance of its suppliers' power-plants. Further, the evidence showed that ETI did not take into account all the attendant impacts of its proposed changes to the test-year data, as is required under the PUC's rules. Among other things, ETI failed to account for increased sales revenue from increased demand, i.e., "load growth," when calculating its estimated increase over test-year costs. Substantial evidence supports the PUC's finding that ETI's projected future purchased-capacity costs were not known and measurable changes to the test year.

Similarly, ETI's transmission-equalization expense projections were not reasonably certain. The evidence showed that the level of this expense that ETI would actually incur in the rate year is based on numerous variables that would not be known until the future. Indeed, projecting future transmission-equalization expense requires making estimates regarding not only ETI's future operations and demand, but also about those of every other Entergy affiliate on the Entergy system. Additionally, ETI's transmission-equalization expense projections were based in large part on transmission projects that had not yet been completed, even though ETI will not incur any expense as a result of such projects until they

8

actually go into service. Substantial evidence supports the PUC's finding that ETI's projected future transmission-equalization expenses were not a known and measurable change to the test year.

## ARGUMENT AND AUTHORITIES

**I.    The PUC properly applied its longstanding historical-test-year standard.**

Under its cost-of-service rule, the PUC sets rates based on a historical test year, adjusted for known and measurable changes.[33] With respect to expenses, the rule provides that "*only* the electric utility's historical test year expenses as adjusted for known and measurable changes will be considered . . . ."[34] As the Texas Supreme Court has acknowledged, "PURA requires utilities to file for a rate increase by presenting revenue and expense data from the same 12-month period using a historical test year."[35] PURA defines "test year" as "the most recent 12 months, beginning on the first day of a calendar or fiscal year quarter, for which operating data for a public utility are available."[36]

The use of a historical test year in ratemaking is important for at least two reasons. First, it allows the PUC to look at a utility's actual costs, rather than various competing predictions about what its costs will be in some future period.

---

[33] 16 Tex. Admin. Code § 25.231(a).

[34] 16 Tex. Admin. Code § 25.231(b) (emphasis added).

[35] *City of El Paso*, 883 S.W.2d at 188 (citations omitted).

[36] PURA § 11.003(20).

9

Rates are set for "an indefinite period into the future."[37] And, as ETI acknowledges, there is no true-up or reconciliation for expenses recovered in a utility's base rates.[38] Consequently, the use of a utility's unreliable projections of future expenses could result in captive ratepayers being overcharged for years with no possibility of a refund even if the projections turn out to be inflated.

Second, test-year ratemaking allows for an accurate matching of a utility's costs in a particular period with its sales in the same period.[39] This is important because a utility recovers its non-fuel costs through the base rates it charges its customers. Specifically, each kilowatt hour (kWh) billed to customers recovers a certain amount of expenses.[40] Accordingly, any change in the number of kWh a utility sells also changes the amount of expenses it recovers. In other words, when a utility sells more kWh, it recovers more expenses in its base rates, without any change to its rates. Utilities experiencing load growth will generally experience an increase over time in their *total* costs, even if their per-unit costs remain the same, simply because they are serving more load. But they will also receive more revenues from additional sales to cover these costs. Thus, in setting rates, the time

---

[37] *Suburban Util. Corp.,* 652 S.W.2d at 366.

[38] ETI Appellant's Brief at 20.

[39] *See, e.g., Cent. Power & Light Co.,* 36 S.W.3d at 563-64 (upholding the PUC's decision to deny a post-test-year adjustment that failed to take into account the attendant impacts of increased electricity sales from load growth).

[40] For some customers, costs are recovered through a kilowatt charge in addition to a kWh charge.

period used for expenses must match the time period used for revenues. This fundamental tenet of ratemaking, called the "matching principle,"[41] was acknowledged in the PUC's order when it found that ETI's proposal to establish its purchased power costs based on estimates in the future while simultaneously using historical test year sales level to develop the per-unit rates was "logically inconsistent."[42]

## A. The known and measurable standard.

While ratemaking in Texas is based on a historical test year, the PUC has discretion to adjust the test year for known and measurable changes if (i) the proposed changes can be identified with reasonable certainty, and (ii) all attendant impacts can be accurately identified with reasonable certainty and taken into account.[43] ETI's brief cites to several cases where the PUC's adoption of known and measurable changes has been approved on appeal. But ETI ignores the fact that changes to the test year are within the *discretion* of the PUC. For instance, ETI's quote from the *City of El Paso* case leaves out the Supreme Court's explicit statement that "it is within the *discretion* of the PUC to consider expenditures that occur outside the test year . . . ."[44] The *Suburban Utility* case similarly states that

---

[41] AR Part I, Binder 5, Item 185 (Proposal for Decision at 105).

[42] AR Part I, Binder 5, Item 185 (Proposal for Decision at 109), adopted by AR Part I, Binder 7, Item 244 (Order on Rehearing at 1).

[43] *See* 16 Tex. Admin. Code § 25.231(a); *Cen. Power & Light Co.*, 36 S.W.3d at 564.

[44] *City of El Paso*, 883 S.W.2d at 188 (emphasis added).

11

changes occurring after the test year if known, *may* be taken into account.[45] Notably, the Supreme Court explicitly upheld the PUC's use of a historical test year in that case, overruling a challenge to the use of past data instead of future projections in setting rates.[46] The *Central Power & Light* case recognizes the same, holding that "the [PUC's] authority to allow post-test-year adjustments for 'known and measurable changes to the historical test year data' is discretionary, and its own substantive rules permit such changes only where 'the attendant impacts on all aspects of a utility's operations can be with reasonable certainty identified, quantified, and matched.'"[47]

There is good reason for the broad discretion given to the PUC in deciding when to deviate from a historical test year. Prospective increases in one cost may be offset with decreases in other costs. Or prospective changes in costs may be due to the prospective increases in sales revenues, which may more than offset those costs. For these reasons, the PUC's rules reflect that adjustments to historical test year costs are appropriate only when the proposed changes are

---

[45] *Suburban Util. Corp.*, 652 SW.2d at 366 (emphasis added).

[46] *Id.*

[47] *Cent. Power & Light Co.*, 36 S.W.3d at 563 (citing 16 Tex. Admin. Code § 23.21(b). In a 1998 reorganization of the PUC's rules, the referenced language was moved to what is now 16 Tex. Admin Code § 25.231(c)(2)(F)(IV), the portion of the cost-of-service rule related to invested capital. The Texas Register states: "The post test year language currently appearing in §23.21(b) will be modified and moved to §23.21(d)(2)(G)(i)(IV) and thus apply only to invested capital items. The post test year adjustment language is superfluous in §23.21(b) because the 'test year, adjusted for known and measurable changes' language already allows for such adjustments." 23 Tex. Reg. 11515 (proposed Nov. 13, 1998), *adopted* 24 Tex. Reg. 1377 (Feb. 26, 1999).

known and measurable with reasonable certainty and where the attendant impacts on the utility's revenues, expense, and invested capital can be quantified and matched with reasonable certainty.[48]

In this case, ETI argues that the PUC misapplied the known-and-measurable standard by requiring that changes to test year costs be proven with "absolute certainty," rather than reasonable certainty.[49] ETI offers no cite to the PUC's order to support its extraordinary claim that the PUC applied such a standard, nor is there anything in the record that indicates that the PUC did so. To the contrary, a review of the PUC's order demonstrates that the PUC properly applied the same "reasonable certainty" standard it has applied in numerous other cases and that ETI acknowledges is the proper standard.[50] The PUC explained at length that there was "substantial uncertainty" in ETI's purchased capacity projections, and the PUC so found as to each of the elements of ETI's request.[51] ETI ignores the actual language of the PUC's order in asserting that the PUC must have secretly applied an unachievable standard of absolute certainty.

---

[48] 16 Tex. Admin. Code §§ 25.231(b), 25.234(b).

[49] ETI Appellant's Brief at 26.

[50] *Id*.

[51] AR Part I, Binder 7, Item 244 (Order on Rehearing at FoFs at 72-85).

**B.  ETI's true complaint is with the PUC's cost-of-service rules, not the PUC's application of them.**

It is apparent that ETI's goal is the invalidation of the PUC's longstanding practice of setting rates based on historical data. Indeed, ETI argued throughout the administrative hearing that the PUC's historical-test-year approach was a "regulatory model that's an anachronism" that the PUC should abandon.[52] And ETI's primary position, which the Commission rejected, was that its purchased-capacity expenses should be recovered through a rider without reference to historical data.[53] ETI's fallback proposal also would have disregarded the historical-test-year data by completely displacing it with ETI's speculative future projections. ETI admitted that its proposal to apply purchased-capacity projections from a future period to test year sales was without precedent.[54]

Setting aside the evidentiary problems with ETI's request, which are explained in greater detail below, its appeal suffers from an additional fatal flaw. ETI contends that the PUC was required to make the proposed post-test-year adjustments. But as set forth above, the decision of whether to make such adjustments is a matter that is within the discretion of the PUC. ETI cannot cite a

---

[52] AR Part IV, Binder 43, Vol. B (Tr. at 35, Apr. 24, 2012). *See also* AR Part I, Binder 3, Item 157 (Initial Brief of ETI at 86).

[53] AR Part I, Binder 1, Item 52 (Supplemental Preliminary Order of Public Utility PUC of Texas at 2) ("The PUC finds that Entergy's proposed purchased-power recovery rider should not be considered in this docket due to the related rulemaking that is pending in Project No. 39246.").

[54] AR Part IV, Binder 43, Vol. L (Tr. at 1957-58, May 3, 2012).

14

singe case in which a court held that the PUC was required to make a post-test-year adjustment. Nor can ETI point to any statutory requirement that the PUC make such adjustments, though the Legislature could certainly enact one. ETI's appeal fails for this reason alone.

The PUC and the district court saw ETI's arguments for what they are—a thinly veiled attack on the PUC's longstanding practice of making future rates based on past costs. What ETI actually sought at the PUC, and now seeks here, is to change Texas from a historical-test-year state to a future-test-year state (at least as to expenses). Whatever the policy merits of such an argument, it should be addressed in an agency rulemaking or directed to the Legislature, not to the courts.[55]

## II. Substantial evidence supports the PUC's determination of ETI's purchased-capacity costs.

Substantial evidence supports the amount of ETI's purchased-capacity costs the PUC included in ETI's rates. The scope of review under the substantial-

---

[55] *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 255 (Tex. 1999) (citations omitted) ("A presumption favors adopting rules of general applicability through the formal rulemaking procedures as opposed to administrative adjudication. Allowing an agency to create broad amendments to its rules through administrative adjudication rather than through its rulemaking authority undercuts the Administrative Procedure Act (APA)."); *Amarillo Indep. Sch. Dist. v. Meno*, 854 S.W.2d 950, 957 (Tex. App.—Austin 1993, writ denied) ("When an administrative agency implements new requirements of general applicability, it ordinarily does so through formal rule-making procedures . . . .").

evidence rule is limited.[56]   The issue for the reviewing court is not whether the agency reached the correct conclusion, but whether there is some reasonable basis in the record for the action taken by the agency.[57]   A court may not substitute its judgment for that of the agency.[58]   Substantial evidence requires only more than a mere scintilla, and "the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence."[59]   "At its core, the substantial evidence rule is a reasonableness test or a rational basis test."[60]

A.   **The PUC properly found that ETI's forecasted purchased-capacity costs were not known and measurable.**

The historical test year in this proceeding was July 1, 2010 through June 30, 2011.[61]   During this test year, ETI had purchased-capacity costs of $246 million. This amount consists of purchases from third parties, purchases from affiliates, and

---

[56] PURA § 15.001; Tex. Gov't Code §§ 2001.174, 2001.176.

[57] *See City of El Paso*, 883 S.W.2d at 185.

[58] *Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984) (citing *Gerst v. Guardian Sav. & Loan Ass'n*, 434 S.W.2d 113, 115 (Tex. 1968)).

[59] *Id.* at 452 (citing *Lewis v. Metropolitan Sav. & Loan Ass'n*, 550 S.W.2d 11, 13 (Tex. 1977)).

[60] *City of El Paso,* 883 S.W.2d at 185.

[61] AR Part II, Binder 31 (ETI Ex. 4, Direct Testimony of Joseph F. Domino at 8).

reserve-equalization payments.[62]   ETI's test year costs were actually incurred during the historical test year, were established in the record, and were undisputed.

Nevertheless, ETI sought to ignore them.  In the place of its actual historical test year costs, ETI proposed to use its forecast of the purchased-capacity costs it would incur in what it called a future "rate year," June 1, 2012 through May 31, 2013.[63]  Thus, ETI did not truly seek to include in rates its "historical test year expenses as *adjusted* for known and measurable changes."[64]   Rather, ETI's proposal was to discard its actual test-year expenses altogether and substitute speculative projections of future costs, based on a number of estimates about future usage and contracts.   Based on a vast administrative record, the PUC determined that ETI's projections were not "known and measurable" changes to the historical test year costs.  The PUC set forth its determination in the following findings of fact:

> 72.   ETI's test-year purchased capacity expenses were $245,965,886.

---

[62] AR Part II, Binder 41 (TIEC Ex. 1B, Confidential Exhibits and Workpapers to Direct Testimony of Jeffry Pollock (CONFIDENTIAL 62) Workpapers, Filename: "Exhibits JP-1 and JP-2 HS.xlsx," spreadsheet/tab: "PPC Summary (Test Year)").

[63] AR Part IV, Binder 43, Vol. F (Tr. at 761, Apr. 27, 2012); AR Part II, Binder 35 (ETI Ex. 34A, Confidential Direct Testimony of Robert R. Cooper, Exhibit RRC-1).  As noted above, the period ETI chose did not actually correspond to the rate year as that term is commonly understood. *See supra,* p. 3-4.

[64] *See* 16 Tex. Admin. Code § 25.231(b) (emphasis added).

73.    ETI requested an upward adjustment of $30,809,355 as a post-test-year adjustment to its purchased capacity costs. This request was based on ETI's projections of its purchased capacity expenses during a period beginning June 1, 2012 and ending May 31, 2013 (the rate-year).

74.    ETI's purchased capacity expense projections were based on estimates of rate-year expenses for: (a) reserve equalization payments under Schedule MSS-1; (b) payments under third-party capacity contracts; and (c) payments under affiliate contracts.

75.    ETI's projection of its rate-year reserve equalization payments under Schedule MSS-1 is based on numerous assumptions, including load growths for ETI and its affiliates, future capacity contracts for ETI and its affiliates, and future values of the generation assets of ETI and its affiliates.

76.    There is substantial uncertainty with regard to ETI's projection of its rate-year reserve equalization payments under Schedule MSS-1.

77.    ETI's projection of its rate-year third-party capacity contract payments includes numerous assumptions, one of which is that every single third-party supplier will perform at the maximum level under the contract, even though that assumption is inconsistent with ETI's historical experience.

78.    There is substantial uncertainty with regard to ETI's projection of its rate-year third-party capacity-contract payments.

79.    ETI's estimates of its rate-year purchases under affiliate contracts are based on a mathematical formula set out in Schedule MSS-4.

80.    The MSS-4 formula for rate-year affiliate capacity payments reflects that these payments will be based on ratios and costs that cannot be determined until the month that the payments are to be made.

18

81. Over $11 million of ETI's affiliate transactions were based on a 2013 contract (the EAI WBL Contract) that was not signed until April 11, 2012.

82. There is uncertainty about whether the EAI WBL Contract will ever go into effect.

83. ETI projects purchasing over 300 megawatts (MW) more in purchased capacity in the rate-year than it purchased in the test-year.

84. ETI experienced substantial load growth in the two years before the test-year, and it continues to project similar load growth in the future.

85. ETI did not meet its burden of proof to demonstrate that a known and measurable adjustment of $30,809,355 should be made to its test-year purchased capacity expenses.

86. ETI's purchased capacity expense in this case should be based on the test-year level of $245,965,886.

In an effort to detract from the PUC's detailed and thoroughly supported factual findings, ETI focuses in its brief on three new third-party contracts totaling 618 MW.[65] But ETI fails to acknowledge that all elements of its purchased-capacity projections are interrelated, such that when one component increases, the others will decrease.[66] In fact, ETI's proposal to the PUC consisted of estimating its costs under three new third-party contracts, recalculating the costs of three other third-party contracts based on these estimates, making concomitant changes to the

---

[65] ETI Appellant's Brief at 38.

[66] AR Part I, Binder 5, Item 185 (Proposal for Decision at 101). *See also* AR Part IV, Binder 43, Vol. L (Tr. at 1946-47, May 3, 2012).

amounts of the payments under seven different affiliate contracts, and adjusting the amount of its reserve-equalization payments based on its forecasted capacity purchases.[67] All told, ETI's forecast of its rate year purchased-capacity costs involves fourteen separate and interrelated sources of purchased capacity.

ETI's brief highlights three of the fourteen moving parts and asserts that ETI's projections under each of those contracts were known with reasonable certainty. That was not the case, as the PUC found. But even if it were true, ETI would still not have met its burden to show an increase in its overall purchased capacity, because a post-test-year-adjustment may only be made if all of the attendant impacts can be identified and accounted for with reasonable certainty.[68]

### 1. ETI's projected third-party contract costs were not reasonably certain.

The evidence showed that ETI's third-party contracts do not contain fixed price terms and that the amount ETI will ultimately pay is subject to fluctuation based on a variety of factors.[69] Indeed, ETI admits in its brief that there is uncertainty concerning the payments it will make under the third-party contracts in

---

[67] AR Part II, Binder 35, ETI Ex. 34A (Direct Testimony of Robert R. Cooper, Exhibit RRC-1 (HS)); AR Part II, Binder 41 (TIEC Ex. 1B, Confidential Exhibits and Workpapers to Direct Testimony of Jeffry Pollock (CONFIDENTIAL 62) Workpapers, Filename: "Exhibits JP-1 and JP-2 HS.xlsx," spreadsheet/tab: "PPC Summary (Test Year)").

[68] 16 Tex. Admin. Code § 25.231(c)(2)(F)(i)(IV); *See Cent. Power & Light Co.*, 36 S.W.3d at 564.

[69] AR Part I, Binder 5, Item 185 (Proposal for Decision at 108).

the future.[70]  Nevertheless, ETI asked the PUC—and now asks the Court—to simply trust that any differences between its forecasted rate year costs and the costs it will actually incur will be "very, very small."[71]  The record, however, supports the PUC's finding that ETI's predictions were unreliable.

ETI's third-party contracts are associated with generation units from specific suppliers.  As such, each contract contains numerous provisions that will affect whatever payments ETI will eventually make when the time comes, based in part on the supplier's actual availability and future performance.[72]  ETI witness Richard Cooper acknowledged that historically there have been adjustments to the payments ETI makes under third-party contracts due to availability.[73]  Despite this real-world experience, ETI made no attempt whatsoever to adjust its third-party contract projections to reflect the availability and performance of the plants in question.  Instead, ETI simply assumed that the performance and the availability of

---

[70] ETI Appellant's Brief at 32.

[71] AR Part I, Binder 5, Item 185 (Proposal for Decision at 108); ETI Appellant's Brief  at 32 (arguing that the deviations from the contract will be "very, very small").

[72] AR Part IV, Binder 43, Vol. D (Tr. at 682, 704-05, Apr. 26, 2012).

[73] AR Part IV, Binder 43, Vol. D (Tr. at 704, Apr. 26, 2012); *see also* AR Part II, Binder 41 (TIEC Ex. 1B, Confidential Exhibits and Workpapers to Direct Testimony of Jeffry Pollock (CONFIDENTIAL 62) Workpapers, Filename: "Exhibits JP-1 and JP-2 HS.xlsx," spreadsheet/tab: "PPC Summary (Test Year)").

the supplier power plants would be at their maximum, with no disallowances whatsoever.[74]

Accordingly, ETI's projections assumed consistent numbers, generally an even number, for each month of the contracts, subject to the weighting for seasonal differentials.[75] ETI's actual historical payments for third-party contracts, however, show wide month-to-month variations in purchased power costs, and the round numbers reflecting the maximum contractual payments are largely absent.[76]

Mr. Cooper admitted that, with respect to these third-party contracts, ETI would not know the amount of the actual payments made until the rate year comes and goes.[77] Moreover, ETI made no effort to take historical performance characteristics into account when making its projections of future costs.[78] Indeed, when cross-examined about the variability in purchased-capacity contracts in the past, ETI's witness admitted that he was not familiar with the variance in the test-year purchased-capacity contracts.[79] Thus, not only were ETI's proposed

---

[74] AR Part IV, Binder 43, Vol. D (Tr. at 705, Apr. 26, 2012); AR Part I, Binder 5, Item 185 (Proposal for Decision at 108).

[75] AR Part II, Binder 35 (ETI Ex. 34A, Confidential Direct Testimony of Robert. R. Cooper Exhibit, RRC-1 at lines 1-7).

[76] AR Part II, Binder 41 (TIEC Ex. 1B, Confidential Exhibits and Workpapers to Direct Testimony of Jeffry Pollock (CONFIDENTIAL 62) Workpapers, Filename: "Exhibits JP-1 and JP-2 HS.xlsx," spreadsheet/tab: "PPC Summary (Test Year)").

[77] AR Binder 43, Vol. E (Tr. at 607-09, April 26, 2012) (Confidential).

[78] ETI Initial Br at 33, 35; AR Binder 43, Vol. F (Tr. at 705, Apr. 26, 2012); AR Binder 43, Vol. L Tr. at 1942, May 3, 1942).

[79] AR Binder 43, Vol. L (Tr. at 1960-62, May 3, 2012).

purchased-capacity costs mere projections, they were projections that ignored ETI"s historical experience.

Mindful of its burden to establish that its proposed post-test-year adjustments were known and measurable, ETI implies that its projected future costs are somehow fixed simply because the contracts were in place.[80]  However, the signed contracts provide for variations in costs based on future performance.[81]  Indeed, at the administrative hearing, ETI counsel's attempted to draw a dichotomy between (1) projections and (2) a fixed contractual payment in questioning Mr. Cooper.  Unfortunately for ETI, Mr. Cooper confirmed that the purchased-capacity estimates fall on the "projections" side of that dichotomy:

> Q. (by Mr. Westerburg) Now, are the costs that we're looking at here projections or are they contractually based?
>
> A. Well, they are contractually based ***projections*** . . .[82]

No matter how ETI tries spin it, the third-party purchased-capacity projections for the future are just that—projections.  They are based on numerous assumptions, including that, contrary to history, every supplier performs at the

---

[80] ETI Appellant's Brief at 28.

[81] AR Item IV, Binder 43, Vol. D (Tr. at 682, 704-05, Apr. 26, 2012).

[82] AR Item IV, Binder 43, Vol. D (Tr. at  682, Apr. 26, 2012) (emphasis added).

maximum level throughout every month of the future period. The PUC properly found that the projections were not reasonably certain.

Multiple times in its brief, ETI asserts, in italics, that "*no witness*" challenged ETI's calculations of projected costs under a particular contract.[83] As an initial matter, ETI itself scarcely addressed these issues in its direct testimony, because its primary proposal was to recover these costs under a rider.[84] Further, it cannot be disputed that intervenor witnesses opposed the use of ETI's proposed test-year adjustment for purchased-capacity costs.[85] For example, TIEC witness Jeffry Pollock explicitly asserted that ETI's substitution of projected "rate year" costs for actual test-year costs violated the PUC's rules, "which require that rates be set using an historical Test Year adjusted for known and measurable changes."[86]

Moreover, the record does not consist merely of the prefiled testimony of intervenor or PUC Staff witnesses. The administrative hearing in this case lasted two weeks, and much of the examination and cross-examination concerned ETI's proposed purchased-capacity projections. The record as a whole demonstrates that ETI's projections were substantially uncertain. As set out above, this was shown by: (i) the admissions of ETI's own witnesses that the actual costs could not be

---

[83] ETI Appellant's Brief at 29, 30, 32.

[84] AR Part II, Binder 31, ETI Ex. 7 (Direct Testimony of Phillip May at 23).

[85] AR Part I, Binder 5, Item 185 (Proposal for Decision at 106-107).

[86] AR Part II, Binder 41, TIEC Ex. 1 (Direct Testimony of Jeffry Pollock at 8).

known, (ii) the dramatic contrast between the highly variable purchased capacity costs that ETI's has actually incurred in the past and the round number future projections, and (iii) the absence of anything other than conclusory assertions about what the future purchased capacity costs would be. Substantial evidence supports the PUC's finding that ETI's projected rate-year costs for third-party contracts were not reasonably certain.

### 2. ETI's projected affiliate-contract costs were not reasonably certain.

ETI's projections of its purchases from affiliates under schedule MSS-4 make up the largest component of its projected $276 million in future purchased capacity costs.[87] As with ETI's third-party contracts, ETI's projected future costs under its agreements with its affiliates were substantially uncertain. The affiliate contracts do not set fixed price or quantity terms, and their costs will fluctuate based on the operational conditions that will be experienced in the future.[88] Accordingly, ETI made assumptions about unknown variables to come up with its projected MSS-4 costs for the rate year.[89] Notably, ETI's brief offers no response

---

[87] AR Part II, Binder 35, ETI Ex. 34A (Confidential Direct Testimony of Robert R. Cooper, Exhibit RRC-1).

[88] AR Part I, Binder 5, Item 185 (Proposal for Decision at 102), AR Part IV, Binder 43, Vol. D. (Tr. at 606, Apr. 26, 2012).

[89] *Id.*

to the PUC's finding that the future costs for these affiliate contracts will fluctuate based on numerous operational conditions that cannot be predicted.[90]

The evidence showed that ETI's projections were unreliable. The witness that ETI offered in support of its projected MSS-4 cost calculations, Mr. Cooper, admitted that he was not familiar with how capacity charges are calculated under MSS-4.[91] In fact, he had never even dealt with how capacity charges under MSS-4 were calculated.[92] Yet ETI asked the PUC to accept the projections given to Mr. Cooper without any support whatsoever for that calculation.

Further, the MSS-4 formula contains complicated and interrelated variables for calculating affiliate-capacity costs that are dependent on numerous inputs that cannot be determined until some future time.[93] The determination of the monthly per-unit capacity charge is only part of the equation. There are similar complexities involved in any attempt to project the actual amount of capacity in kW that ETI would purchase in the future.[94] Given the complicated nature of the formula and the fact that numerous inputs are based on events in the future, it is

---

[90] AR Part I, Binder 5, Item 185 (Proposal for Decision at 108), adopted by AR Part I, Binder 7, Item 244 (Order on Rehearing at 1).

[91] AR Part IV, Binder 43, Vol. D (Tr. at 634-36, Apr. 26, 2012).

[92] *Id.*

[93] AR Part II, Binder 42, TIEC Ex. 22 ("Service Schedule MSS-4 Unit Power Purchase, Exhibit PJC-1, 2011 TX Rate Case" at 68-69).

[94] AR Part II, Binder 42, TIEC Ex. 22 ("Service Schedule MSS-4 Unit Power Purchase, Exhibit PJC-1, 2011 TX Rate Case" at 62-63); AR Part IV, Binder 43, Vol. E (Tr. at 628-29, Apr. 26, 2012) (Confidential).

little wonder that Mr. Cooper could offer no support or explanation for the projection he was given.[95] ETI's evidence in support of the MSS-4 projections amounts to little more than Mr. Cooper's statement that someone else at ETI had made these calculations and that, even though he could not support them, the PUC should accept them.[96]

ETI's brief asserts that the uncertainty about the affiliate purchases can be ignored because the amounts were not that much different than the test year amounts for this particular source of purchased capacity.[97] ETI ignores the fact, however, that the various sources of purchased capacity are interrelated so that, as the amount of capacity from one source increases, the amount from other sources will decrease. ETI's test-year affiliate-purchased-capacity costs were incurred in a world without the additional third-party purchased-capacity contracts that ETI projected for the future period. ETI offered nothing but conclusory assertions for how its affiliate-purchased-capacity costs would be affected by the new third-party contracts.[98]

ETI's contract with Entergy Arkansas (the EA WBL contract), which accounts for more than one-third of ETI's projected $31 million increase in purchased-capacity costs over the test year, highlights the problems with ETI's

---

[95] AR Part IV, Binder 43, Vol. D (Tr. at 634-36, Apr. 26, 2012) (Confidential).
[96] AR Part IV, Binder 43, Vol. D (Tr. at 634-36, Apr. 26, 2012).
[97] AR Part I, Binder 3, Item 157 (ETI Initial Br. at 39).
[98] *See, e.g.,* AR Part IV, Binder 43, Vol. E (Tr. at 607-609, Apr. 26, 2012) (Confidential).

projected affiliate-contract expenses. The evidence showed that ETI's costs under this contract, which ETI executed only days before the administrative hearing and months after it initiated the underlying proceeding, were substantially uncertain. Pricing under the contract was not determined at the time of the PUC proceeding, but would instead be set based on the MSS-4 schedule in 2013.[99] The quantity of capacity ETI ultimately purchases under the EA WBL contract was also unknown; it would be based on a yet-to-be-determined allocation percentage between ETI and its Entergy affiliates.[100] In fact, it was not clear that the contract would ever go into effect, because it was contingent on ETI receiving regulatory approvals that it had not yet received at the time of the PUC proceeding.[101] And even if it did go into effect, it would be subject to two further revisions before ETI ever received any power.[102] The EAI contract is a prime example of why the PUC properly found that ETI's affiliate-cost projections were not reasonably certain.

### 3. ETI's projected MSS-1 costs were not reasonably certain.

The third component of ETI's purchased-capacity cost projections was for MSS-1 payments, also known as reserve-equalization payments. Reserve-equalization payments are payments among various ETI affiliates relating to each

---

[99] AR Part I, Binder 5, Item 185 (Proposal for Decision at 102) (citing AR Part II, Binder 37, ETI Ex. 47 (Rebuttal Testimony of Robert R. Cooper at RRC-R-1), and AR Part IV, Binder 43 (Tr. at 628-9, Apr. 26, 2012)).

[100] *Id.*

[101] *Id.*

[102] *Id.*

affiliate's proportionate share of the Entergy System capacity.[103] MSS-1 payments reflect that some affiliates are "long" on capacity while others are "short" on capacity.[104] As a utility purchases capacity from third parties or affiliates, its MSS-1 payments will decrease, all other things equal. Reserve equalization payments are based on a complex formula in the Entergy System Agreement.[105] In order to make an estimate of future costs, ETI was required to project not only its own load growth, but also the load growth of every other Entergy affiliate.[106]

ETI acknowledges that if the load of even one Entergy affiliate is less than predicted, ETI's projected MSS-1 payments would change.[107] MSS-1 payments would also change if there was increased load growth for ETI or any affiliate.[108] Or if any one of the other Entergy affiliates signed a new purchased-capacity contract.[109] Or if the future book value of the generation assets of any Entergy affiliate was not identical to projections.[110] ETI admitted at the hearing that there was "some uncertainty" in its MSS-1 projections.[111] In fact, ETI's projections were so uncertain that ETI proposed to change them by $4.5 million in a brief *after*

---

[103] AR Part II, Binder 36, ETI Ex. 39 (Direct Testimony of Patrick J. Cicio at 11-12).

[104] *Id.*

[105] AR Part II, Binder 36, ETI Ex. 39 (Direct Testimony of Patrick J. Cicio at Exhibit PJC-1 at 30-37).

[106] AR Part IV, Binder 43, Vol. D (Tr. at 651-52, Apr. 26, 2012).

[107] AR Part IV, Binder 43, Vol. D (Tr. at 651-52, Apr. 26, 2012).

[108] *Id.*

[109] *Id.*

[110] AR Part IV, Binder 43, Vol. L (Tr. at 1915, May 3, 2012).

[111] *Id.* at 1918-19.

*the administrative hearing on the merits had concluded.*[112]  It is easy to see why the PUC did not find ETI's cost projections to be reasonably certain.  As with the other components of its $276 million purchased capacity projections, the projected MSS-1 costs were cobbled together from a host of unexplained assumptions and prognostications.  Substantial evidence supported the PUC's decision to reject them.

### 4. ETI's proposal failed to account for revenues from load growth.

In addition to ETI's cost estimates being uncertain, the evidence also showed that ETI failed to take into account attendant impacts related to its proposed adjustment and failed to comply with the matching principle.  As the PUC found, ETI based its projections of future capacity costs on the assumption that it will experience higher sales in that future period.[113]  But ETI's proposal would set rates by applying its higher projected purchased-capacity costs for the future period to its sales (*i.e.*, billing determinants) from the past test year.[114]

ETI's proposal ignores the fact that utilities purchase or build capacity in order to meet their projected demands, and that increased demands bring higher revenues.  Any utility experiencing growth in the amount of electricity it sells will necessarily have to build or buy additional capacity to meet that growth.  For such

---

[112] AR Part I, Binder 3, Item 157 (ETI Initial Br. at 77).
[113] AR Part I, Binder 5, Item 185 (Proposal for Decision at 109).
[114] *Id.*

30

a utility, the *total* cost of capacity in the future will almost always be higher than the *total* cost of capacity in a prior period (unless the unit cost of capacity is falling at a faster rate than the sales are increasing). Critically, however, the revenues that the utility receives in the future period will also increase as its load grows. Thus, assuming the per-unit cost of capacity remains constant, any increase in *total* capacity costs will be paid for by the increase in *total* capacity-related revenues. And even if the per-unit cost of capacity increases, the increase in capacity-related revenues will still partially offset the increased capacity costs.[115] Accordingly, in accordance with the matching principle,[116] the PUC sets rates based on a concurrent review of costs and sales in the same year.

It is undisputed that ETI was experiencing load growth. For the two-year period preceding the test year, ETI's retail sales (measured in kW) grew by over 7%.[117] For the two years beyond the test year, ETI projected an overall increase in ETI's capacity of about 7.8%.[118] In fact, at the time of the administrative hearing, ETI had already contracted for 6% more load in the rate year.[119] The evidence thus showed that ETI projected load growth, and the PUC properly found that ETI's

---

[115] The Proposal for Decision contains a hypothetical illustrating this point. AR Part I, Binder 5, Item 185 (Proposal for Decision at 105).

[116] AR Part II, Binder 41, TIEC Ex. 1 (Direct Testimony of Jeffry Pollock at 18-19).

[117] AR Part IV, Binder 43, Vol. B (Tr. at 128-30, Apr. 24, 2012).

[118] *Id.* at 1540.

[119] AR Part I, Binder 5, Item 185 (Proposal for Decision at 109) (citing AR Part II, Binder 37, ETI Ex. 47 (Rebuttal Testimony of Robert R. Cooper at 4); AR Part IV, Binder 43, Vol. D (Tr. at 667-68, Apr. 26, 2012).

proposal to mix test-year billing determinants and projected future costs was "logically inconsistent" and a violation of the matching principle.[120]

Indeed, ETI does not deny that load growth increases its revenues and can thus offset increased costs, such as purchased-capacity costs. Instead, ETI argues that the PUC is simply not allowed to consider load growth when making post-test-year adjustments.[121] Specifically, ETI argues that if it the PUC were supposed to consider future load growth in setting base rates, the Legislature would have said so.[122] ETI fails to mention, however, that the Legislature has not directed the PUC to consider *projected future expenses* in setting base rates either. ETI nonetheless proposed that future expenses should be considered, but that future revenues should be ignored. The PUC properly rejected this illogical request.[123] Moreover, while ETI has cited no authority for the proposition that the PUC may not consider load growth in determining post-test-year adjustments, this Court has come to the opposite conclusion. In *Central Power & Light Co.*, the Court upheld the PUC's decision to deny a post-test-year adjustment that failed to take into account the attendant impacts of increased electricity sales from load growth.[124] If ETI

---

[120] AR Binder 5, Item 185 (Proposal for Decision at 109).

[121] ETI's appellant's brief at 32-33.

[122] *Id.*

[123] AR Part I, Binder 7, Item 244 (Order on Rehearing at 7).

[124] *E.g., Cent. Power & Light Co.*, 36 S.W.3d at 564 (upholding the PUC's decision to deny a post-test-year adjustment that failed to take into account the attendant impacts of increased electricity sales from load growth).

believes that the PUC should stop considering load growth when evaluating post-test-year adjustments, it should take that policy matter up with the Legislature, not the courts.

ETI also argues that the load growth would not materialize for two years and complains that the intervenor witnesses failed to quantify the effect of load growth or, in the case of the Cities' witness, got it wrong.[125] Initially, ETI had the burden of proof, not intervenors. It was not intervenors' job to fix ETI's proposed test-year adjustment. Further, the evidence showed that ETI would experience load growth during its proposed rate year, and that this would offset at least some of ETI's future expenses.[126] Moreover, multiple intervenor witnesses testified that when all the proper attendant impacts were taken into account, ETI's future purchased-capacity costs would be lower than its test-year costs, not higher.[127] ETI did not meet its burden of identifying with reasonable certainty its future purchased-capacity costs net of increased revenues due to load growth.

In summary, there was substantial evidence to support the PUC's findings that ETI's speculative rate-year projections were not known and measurable, that ETI failed to identify, quantify, and match all attendant impacts of its proposed

---

[125] ETI Appellant's Brief at 33.

[126] AR Part I, Binder 5, Item 185 (Proposal for Decision at 109), AR Part I, Binder 7, Item 244 (Order on Rehearing at FoF 84).

[127] AR Part II, Binder 9, Cities Ex. 6C (Confidential Direct Testimony and Exhibits of Karl J. Nalepa at 17); AR Part II, Binder 8, Cities Ex. 4 (Direct Testimony of Dr. Dennis W. Goins at 19); AR Part II, Binder 41, TIEC Ex. 1 (Direct Testimony and Exhibits of Jeffry Pollock at 27).

adjustment with reasonable certainty, and that its proposal violated the matching principle.

### B. Having failed to meet its burden of proof, ETI is not entitled to its proposed post-test-year adjustments.

ETI repeatedly argues that the PUC must have erred because it did not allow ETI to recover at least some of its projected increase to its test-year expenses for purchased capacity.[128] This contention ignores the fact that ETI had the burden of proving that its changes to its historical-test-year costs were known and measurable.[129] ETI could have relied on the test-year costs, which were established in the record. But instead it elected to seek recovery of its forecasted expenses for a future year. For the reasons discussed above, the PUC properly found that ETI did not meet its burden of proving that its projected costs were known and measurable. Accordingly, ETI's contention that it was entitled to at least some of it its proposed $31 million increase over the actual test-year costs makes little sense. Indeed, it would have been arbitrary and capricious for the PUC to determine that ETI's forecast was unreliable because its costs were substantially uncertain, but to nevertheless award ETI some fraction of its estimated increase anyway. The PUC's decision to reject ETI's speculative projections was supported by substantial evidence.

---

[128] ETI Appellant's Brief at 27, 39.
[129] PURA § 36.006; *Central Power & Light Co.*, 36 S.W.3d at 564.

Further, ETI's complaint that a "wholesale disallowance"[130] of its projected purchased-capacity increases was unwarranted is belied by the evidence. During the course of the PUC proceeding, three intervenor witnesses produced their own analyses of what ETI's purchased-capacity costs would look like if the test-year data were adjusted. Notably, all three concluded that ETI's costs would be *lower* than what it actually incurred in the test year by estimates ranging from $3 million to $8 million.[131] Thus, even if the PUC had decided to descend into the rabbit hole and engage in ratemaking by prognostication, it had evidence before it that ETI was not entitled to any increase over test-year costs whatsoever. ETI's contention that it proved entitlement to at least some increase over its test-year costs is without merit.

For all of the foregoing reasons, a reasonable basis exists in the record for the PUC's decision that ETI did not meet its burden of proving that its projected future purchased-capacity costs were known and measurable changes to the test year.[132]

---

[130] ETI's appellant's brief at 27.

[131] AR Part I, Binder 5, Item 185 (Proposal for Decision at 106-7); AR Part II, Binder 9, Cities Ex. 6C (Confidential Direct Testimony and Exhibits of Karl J. Nalepa at 17); AR Part II, Binder 8, Cities Ex. 4 (Direct Testimony of Dr. Dennis W. Goins at 19); AR Part II, Binder 41, TIEC Ex. 1 (Direct Testimony and Exhibits of Jeffry Pollock at 27).

[132] *City of El Paso,* 883 S.W.2d at 185; PURA § 36.006.

**III.** **The PUC properly rejected ETI's proposal to base transmission equalization expense on projections of future costs.**

The analysis is the same for the PUC's rejection of ETI's proposed post-test-year adjustment to its transmission-equalization expense. During the test year, ETI incurred $1.754 million of actual transmission-equalization expense.[133] Instead of relying on this number, ETI proposed that its rates be set based upon a future projection of $10.697 million in transmission equalization expense, which ETI asserted was a forecast of its rate-year (*i.e.,* June 2012 through May 2013) expense.[134] The evidence showed that ETI's projection was speculative and unreliable. ETI's rate-year expense would be driven by uncertain future costs and loads of each of the Entergy Operating Companies ("EOCs").[135] Moreover, ETI's $8.9 million upward adjustment was premised on costs for transmission projects that were in varying stages of design and construction and would not actually impact its equalization costs until they were completed and in service. Based on the evidence, the PUC made the following findings of fact:

> 87. ETI incurred $1,753,797 of transmission equalization expense during the test-year.

---

[133] AR Part II, Binder 9, Cities Ex. 28 (ETI Response to Cities 3-3(g)).

[134] AR Part II, Binders 21-30, ETI Ex. 3 (Schedule P Workpapers at AJ23).

[135] At the time of the hearing, the EOCs were Entergy Arkansas, Inc. ("EAI"), Entergy Gulf States Louisiana, LLC ("EGSL"), Entergy Louisiana, LLC ("ELL"), Entergy Mississippi, Inc. ("EMI"), Entergy New Orleans, Inc. ("ENOI"), and Entergy Texas, Inc. ("ETI"). AR Part IV, Binder 43, Vol. F (Tr. at 734-37, Apr. 27, 2012).

88. ETI proposed an upward adjustment of $8,942,785 for its transmission equalization expense. This request was based on ETI's projections of its transmission equalization expenses during the rate-year.

89. The transmission equalization expense that ETI will pay in the rate-year will depend on future costs and loads for each of the Entergy operating companies.

90. ETI's projection of its rate-year transmission equalization expenses is uncertain and speculative because it depends on a number of variables, including future transmission investments, deferred taxes, depreciation reserves, costs of capital, tax rates, operating expenses, and loads of each of the Entergy operating companies.

91. ETI seeks increased transmission equalization expenses for transmission projects that are not currently used and useful in providing electric service. ETI's post-test-year adjustment is based on the assumption that certain planned transmission projects will go into service after the test-year. At the close of the hearing, none of the planned transmission projects had been fully completed and some were still in the planning phase.

92. It is not reasonable for ETI to charge its retail ratepayers for transmission equalization expenses related to projects that are not yet in-service.

93. ETI's request for a post-test-year adjustment of $8,942,785 for rate-year transmission equalization expenses should be denied because those expenses are not known and measurable. ETI's post-test-year adjustment does not with reasonable certainty reflect what ETI's transmission equalization expense will be when rates are in effect.

94. ETI's transmission equalization expense in this case should be based on the test-year level of $1,753,797.

As set forth below, the record is replete with evidence to support these findings and the PUC's holding that "ETI's post-test-year adjustment does not with reasonable certainty reflect what ETI's transmission equalization expense will be when rates are in effect."[136]

## A.    Substantial evidence supports the PUC's decision.

The Entergy System Agreement ("ESA") requires that the various EOCs equalize the ownership and operating costs of certain transmission investment across the system.[137]    Transmission-equalization expense accordingly relates to monthly payments that ETI makes (or receives) based upon the obligation to share the costs of transmission capacity on the Entergy System.   In some years, ETI makes transmission equalization payments; in other years, it is a recipient of payments. As explained below, there are a host of variables that drive an EOC's monthly transmission equalization obligation, including the loads of the various operating companies vis-à-vis the Entergy System and the in-service dates of transmission investment.

---

[136] AR Part I, Binder 7, Item 244 (Order on Rehearing at 21).

[137] Inter-transmission investment is defined in Service Schedule MSS-2 of the ESA and generally includes transmission line investment at 230 kV and above, as well as certain investment in transmission substations and certain lines 115 kV and higher from an owning company's last substations to the connecting point of another company. *See* AR Part II, Binder 36, ETI Ex. 39 (Direct Testimony of Patrick J. Cicio at Exhibit PJC-1 at 38).

38

### 1. ETI's transmission-equalization costs are variable and uncertain.

Entergy performs "transmission equalization" based upon a complex six-page formula set out in Service Schedule MSS-2 ("MSS-2") of the ESA.[138] At the hearing, ETI witness Patrick Cicio testified that ETI's forecast of transmission equalization expense was based upon a number of variables from each of the six EOCs that are inter-dependent and that would affect ETI's ultimate transmission equalization expense during the rate year. These variables include:

- Future transmission investment for each EOC;[139]
- Future deferred taxes for each EOC;[140]
- Future depreciation reserves for each EOC;[141]
- Future costs of capital for each EOC (including capital structure and cost of debt and preferred and common equity);[142]
- Future tax rates for each EOC;[143]
- Future operating expenses for each EOC (including depreciation factors, insurance expense, property tax, franchise tax, and operations and maintenance expense); and[144]

---

[138] AR Part II, Binder 36, ETI Ex. 39 (Direct Testimony of Patrick J. Cicio at Exhibit PJC-1 at 38-43).

[139] AR Part IV, Binder 43, Vol. F (Tr. at 738, Apr. 27, 2012).

[140] *Id*. at 740.

[141] *Id*. at 741.

[142] *Id*.

[143] *Id*. at 742.

[144] *Id*. at 742-43.

- Future responsibility ratios for each EOC, which are based upon a rolling 12-month average of each EOC's peak usage coincident with the Entergy System peak usage.[145]

The steps of the complicated calculation that Entergy performs each month to calculate transmission expense are in the record in this case.[146] The calculation shows that ETI's transmission-equalization expense will change should there be a change in any one of the EOC's forecasted amounts of transmission investment, sales, or operating costs, or a change to the cost of capital. ETI's post-test-year adjustment was therefore predicated on a calculation that required numerous predictions about uncertain future capital costs, expenses, and load for each of the EOCs. The assertion that ETI would incur $10.7 million in MSS-2 expense in its rate year was therefore dubious and did not meet the known and measurable standard set forth by 16 Tex. Admin. Code § 25.231(a).

## 2. ETI's projections were based on projects that were not yet in-service.

ETI's projected transmission-equalization expenses are particularly speculative because they are premised on investment related to transmission projects that were not yet in-service and were in varying stages of design and

---

[145] *Id*. at 746-48.

[146] AR Part II, Binder 9, Cities Ex. 39 ("Attachment 3, Summary of Monthly MSS-2 Calculation") and AR Part II, Binder 41, TIEC Ex. 1 (Direct Testimony and Exhibits of Jeffry Pollock at JP-3).

construction.[147]  ETI witness Mark McCulla explained that the primary driver of the $10.697 million forecasted increase over test-year costs was based on an anticipated $184.9 million of additional transmission investment on the Entergy System for the period June 2012 through May 2013.[148]  However, at the administrative hearing, he conceded that the majority of the projects driving the investments were still in the design and construction phase and had not yet been completed.[149]  Indeed, some of the projects had projected completion dates as far out as December 2012, six months after the new rates in the case were to go into effect on June 30, 2012.[150]  It was therefore unclear when these projects would actually go into service.  As ETI witness Mr. Cicio admitted:  "In-service dates can change.  They could go forward.  They could go backward.  I've seen it both ways."[151]

Investment is not counted for MSS-2 calculation purposes until the transmission is actually in service and providing electric service to customers.[152]

---

[147] *See* AR Part II, Binder 36, ETI Ex. 39 (Direct Testimony of Patrick J. Cicio at Ex. PJC-1 at 39).  *See also* AR Part IV, Binder 43, Vol. F (Tr. at 770, Apr. 27, 2012).

[148] AR Part II, Binder 37, ETI Ex. 59 (Rebuttal Testimony of Mark F. McCulla at 2 and Exhibit MFM-R-1).

[149] AR Part II, Binder 37, ETI Ex. 59 (Rebuttal Testimony of Mark F. McCulla at 2 and Exhibit MFM-R-1); AR Part IV, Binder 43, Vol. C (Tr. at 457-58, Apr. 25, 2012).

[150]  *See* AR Part II, Binder 37, ETI Ex. 59 (Rebuttal Testimony of Mark F. McCulla at Exhibit MFM-R-1).

[151] AR Part IV, Binder 43, Vol. F (Tr. at 773, Apr. 26, 2012).

[152] AR Part IV, Binder 43, Vol. F (Tr. at 769, Apr. 27, 2012). *See also* AR Part II, Binder 36, ETI Ex. 39 (Direct Testimony of Patrick J. Cicio at Exhibit PJC-1 at 39).

Thus, there is no impact to ETI's transmission-equalization expense until these projects actually go into service. For this reason alone, ETI's future transmission-equalization expense was not reasonably certain.

Given the lack of certainty regarding ETI's estimates of its transmission investment in-service dates, as well as the numerous other variables that affect the MSS-2 calculation, the PUC had considerable evidence upon which to base its determination that ETI has not met its burden of proving its post-test-year adjustment was known and measurable.[153] The PUC's decision on transmission-equalization expense should be upheld.

## CONCLUSION AND PRAYER

For the foregoing reasons, TIEC prays that the Court affirm the district court's judgment upholding the PUC's determination of the amount of ETI's purchased-capacity and transmission-equalization expenses that should be included in rates and grant TIEC any and all other relief to which it is entitled.

---

[153] AR Part I, Binder 7, Item 244 (Order on Rehearing at 21).

Respectfully submitted,

*/s/ Rex D. VanMiddlesworth*
Rex D. VanMiddlesworth
rex.vanmiddlesworth@tklaw.com
State Bar No. 20449400
Benjamin Hallmark
benjamin.hallmark@tklaw.com
State Bar No. 24069865
**THOMPSON & KNIGHT LLP**
98 San Jacinto Blvd., Suite 1900
Austin, TX 78701
Telephone: (512) 469-6100
Facsimile: (512) 469-6180

**ATTORNEYS FOR APPELLEE TEXAS
INDUSTRIAL ENERGY CONSUMERS**

## CERTIFICATE OF COMPLIANCE

I certify that this document contains 10,486 words in the portions of the document that are subject to the word limits of Texas Rule of Appellate Procedure 9.4(i), including the Glossary of Abbreviations, as measured by the undersigned's word-processing software.

*/s/ Benjamin Hallmark*

**CERTIFICATE OF SERVICE**

As required by Texas Rule of Appellate Procedure 9.5, I certify that on the 30th day of April, 2015, the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy was served on the following lead counsel for all parties listed below via electronic service:

| | |
|---|---|
| *Counsel for Entergy Texas, Inc.* | Marnie A. McCormick<br>Patrick J. Pearsall<br>Duggins Wren Mann & Romero, LLP<br>600 Congress Ave., Ste. 1900<br>Austin, Texas 78701<br>512.744.9300<br>512.744.9399 (fax)<br>mmccormick@dwmrlaw.com<br>ppearsall@dwmrlaw.com |
| *Counsel for the Public Utility Commission of Texas* | Elizabeth R. B. Sterling<br>Megan M. Neal<br>Environmental Protection Division<br>Office of the Attorney General<br>P.O. Box 12548<br>Austin, Texas 78711-2548<br>512.463.2012<br>512.457.4616 (fax)<br>elizabeth.sterling@texasattorneygeneral.gov |
| *Counsel for Office of Public Utility Counsel* | Sara J. Ferris<br>Office of Public Utility Counsel<br>1701 N. Congress Ave., Ste. 9-180<br>P.O. Box 12397<br>Austin, Texas 78711-2397<br>512.936.7500<br>512.936.7520 (fax) |

44

Sara.ferris@opuc.texas.gov

*Counsel for State Agencies*

Katherine H. Farrell
Assistant Attorney General
Administrative Law Division
Energy Rates Section
Office of the Attorney General
P.O. Box 12548, MC 018-12
Austin, Texas 78711-2548
512.475.4237
512.320.0167 (fax)
katherine.farrell@texasattorneygeneral.gov

*Counsel for Cities*

Daniel J. Lawton
The Lawton Law Firm, P.C.
12600 Hill Country Blvd.,
Ste. R-275
Austin, TX 78738
512.322.0019
855.298.7978 (fax)
dlawton@ecpi.com

*/s/ Benjamin Hallmark*